IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>JON MCBRIDE,<br><br>                Defendant. | **FINDINGS OF FACT,<br>CONCLUSIONS OF LAW, AND ORDER**<br><br>Case No. 2:09-cv-378 DN<br><br>District Judge David Nuffer |

Plaintiff United States of America brought this case to collect a civil penalty assessed to Defendant Jon McBride for his alleged willful failure to report his interest in four foreign bank accounts during tax years 2000 and 2001 as required under 31 U.S.C. § 5314 and related regulations.  The matter was tried to the bench on May 21-22, 2012, and the court took the matter under advisement.  The parties have submitted competing proposals as to the facts and legal conclusions that should be reached.[1]  Having carefully considered the parties' proposals, along with the record of the hearing and applicable law, the court enters the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

**A.      McBride Was the Co-Owner of The Clip Company.**

1.      Jon McBride is a citizen of the United States, was a citizen of the United States in 2000 and 2001, and has been since at least 1999. (Tr. 310:12-15, May 22, 2012).

---

[1] Proposed Findings of Fact and Conclusions of Law [submitted by United States of America], docket no. 101, filed July 23, 2012; Defendant Jon McBride's Proposed Findings of Fact and Conclusions of Law, docket no. 104, filed August 22, 2012.

2.      McBride and Scott Newell ("Newell") were equal partners in The Clip Company, LLC (the "Clip Company"), a company which sold belt clip accessories for cellular telephones. (Tr. 315:12-317:7, May 22, 2012).

3.      The Clip Company was in continuous operation from 1994 to 2008. (Tr. 268:10-12, May 22, 2012).

4.      McBride was responsible for the financial operations of the Clip Company, including keeping accounting records, and preparing quarterly and yearly reports for the Clip Company. (Tr. 268:13-269:7, May 22, 2012).

5.      The only individual other than McBride involved in the financial operations of the Clip Company was the Clip Company's accountant, Craig Stayner. (Tr: 268:25-269:7, May 22, 2012).

6.      The Clip Company utilized a manufacturer located in Taiwan, Piao Shang, Ltd., ("Piao Shang"), for the production of its inventory. (Tr. 118:17-119:22); (Tr. 318:15-22, May 22, 2012).

7.      Beginning in approximately 1999, the Clip Company entered into several lucrative contracts for the sale of its products to retailers including Ericsson, AT&T, Best Buy and Motorola. (Tr. 269:8-11, May 22, 2012).

8.      As a result of the Clip Company's new contracts, McBride knew that the Clip Company was about to obtain a large increase in revenue. (Tr. 269:12-15, May 22, 2012).

9.      In anticipation of this increase in revenue, McBride sought a way to reduce or defer the income taxes that would normally be paid on this revenue. (Tr. 269:16-20, May 22, 2012).

**B.**   **Merrill Scott and Associates Was a Financial Management Firm that Employed Strategies Designed to Disguise the Ownership of Its Clients' Assets.**

10.     Merrill Scott and Associates ("Merrill Scott") held itself out as a financial management firm that employed strategies that would allow its clients to avoid or defer the recognition of income for tax purposes and to shield their assets from the reach of creditors by utilizing, amongst other financial strategies and instruments, foreign variable annuities and foreign financial accounts. *See* (Pl. Exs. 10, 11, 12, 13, 81); (Pl. Ex. 118, Ackerson Dep. Tr. 15:7-14; 15:21-16:13; 25:24-26:10; 69:24-70:13).

11.     In reality, Merrill Scott's strategies were designed to allow its clients to avoid reporting income and their ownership of assets by having the clients' assets held by nominees holding the legal title of shell corporations and foreign bank accounts. *See* (Pl. Exs. 10, 11, 12, 13, 81); (Pl. Ex. 118, Ackerson Dep. Tr. 15:7-14; 15:21-16:13; 25:24-26:10; 69:24-70:13); (Tr. 36:24-37:21, May 21, 2012).

12.     Among other strategies, Merrill Scott and its clients purchased foreign variable annuities, set up International Business Corporations ("IBCs") that were incorporated in foreign countries for the benefit of individual clients, established bank and securities accounts in foreign countries, and created foreign trusts and other vehicles that would hold assets for the benefit of Merrill Scott's clients. *See* (Pl. Exs. 10, 11, 12, 13, 81); (Pl. Ex. 118, Ackerson Dep. Tr. 15:7-14; 15:21-16:13; 25:24-26:10; 69:24-70:13).

13.     In 2002, a complaint was filed against Merrill Scott and its principals by the Securities and Exchange Commission for various securities violations, including various Securities Act violations and fraud. *See* (Ex. 81); (Tr. 69:20-70:23, May 21, 2012); (Tr. 347:7-14, May 22, 2012).

**C.**     **McBride Retained the Services of Merrill Scott in Order to Avoid or Defer Taxation.**

14.     In 1999, after seeing an advertisement for Merrill Scott, McBride contacted Merrill Scott in order to see if Merrill Scott could provide financial services that would result in avoiding or deferring the recognition of $2 million in income that McBride expected to receive. (Tr. 39:21-41:1, May 21, 2012); (Tr. 320:12-321:11, May 22, 2012).

15.     On or around July 20, 1999, McBride went to Merrill Scott's offices where he was given a presentation by several employees of Merrill Scott that described the various strategies that might be utilized by McBride, Newell, and the Clip Company. *See* (Pl. Ex. 12).

16.     Merrill Scott's employees described that the various strategies available would be implemented in a "Master Financial Plan," which would utilize various IBCs, foreign financial accounts, foreign variable annuities, all for the benefit of McBride, Newell, and the Clip Company. *See* (Pl. Ex. 12).

17.     After McBride was given an explanation of Merrill Scott's program, he responded, "This is tax evasion." (Tr. 321:22-23, May 22, 2012).

18.     Merrill Scott employees responded that their programs were legal. (Tr. 321:24, May 22, 2012).

19.     Merrill Scott employees told McBride that "your plan will be one of the cleanest we have." (Tr. 323:6-7, May 22, 2012).

20.     McBride expressed his intention that Merrill Scott set up a structure that would move profits of the Clip Company offshore. (Tr. 40:17-22, May 21, 2012); (Tr. 108:8-13, May 21, 2012); (Tr. 393:12-14, May 22, 2012).

**D.      McBride Purchased Merrill Scott's Master Financial Plan Without First Obtaining an Outside Legal Opinion.**

21.     Merrill Scott provided McBride with several pamphlets and materials containing questions and answers regarding how the strategies employed by Merrill Scott interacted with extant income tax and reporting regulations. *See* (Pl. Exs. 10, 11); (Tr. 322:4-10, May 22, 2012).

22.     One of these pamphlets, entitled "Going Offshore: What is it and is it safe," included the following language under the heading "Tax Savings": "US citizens are subject to specific US reporting requirements for interests in foreign corporations, trusts and bank accounts. US citizens and others filing Internal Revenue Service returns are not immune from requisite declaration of ownership interests in foreign entities." *See* (Pl. Ex. 10).

23.     In that meeting, McBride was provided a legal opinion prepared by the Estate Planning Institute, P.C. (Tr. 322:4-8, May 22, 2012).

24.     No later than July 29, 1999, McBride was informed that the Estate Planning Institute, P.C. was an entity controlled by or related to Merrill Scott. *See* (Pl. Ex. 13).

25.     McBride did not understand the process by which Merrill Scott proposed to somehow legally move the Clip Company's U.S. revenue offshore. (Tr. 323:9-15, May 22, 2012).

26.     On December 10, 2009, McBride stated, under penalty of perjury, that he "reviewed and considered all [Merrill Scott]-based literature and marketing information, including its 'due diligence' information on each of its officers and its track record pertaining to being in 'good standing' with Utah. This information includes (but is not all-inclusive) . . . the legal opinion included as part of McBride's initial disclosures, and the packet of [Merrill Scott] literature . . ." (Pl. Ex. 3, Response 6).

27.     McBride testified at trial that he did not read the legal opinion provided to him by the Estate Planning Institute. (Tr. 402:6-16, May 22, 2012).

28.     On November 17, 2010, under penalty of perjury, McBride stated that he specifically read and asked questions from the pamphlet entitled "Questions and Answers." (Pl. Ex. 71, ¶ 4).

29.     The pamphlet entitled "Questions and Answers," contains the following language under a heading entitled, "Why not just hide all my assets in a Swiss Account?": "As a U.S. taxpayer, the law requires you to report your financial interest in, or signature authority over, any foreign bank account, securities account, or other financial account. . . . Intentional failure to comply with the foreign account reporting rule is a crime and the IRS has means to discover such unreported assets." *See* (Pl. Ex. 11, pp. MB0130-MB0131).

30.     McBride never obtained an outside legal opinion from an attorney about the legality of Merrill Scott's financial strategies. (Tr. 271:11, May 22, 2012).

31.     McBride never sought advice from his accountant at the time, Craig Stayner, on whether or not to purchase a Master Financial Plan from Merrill Scott. (Tr. 270:18-25, May 22, 2012).

32.     McBride was "gung ho" on Merrill Scott and the Master Financial Plan. *See* (Pl. Ex. 117, Newell Dep. Tr. 37:1-3).

33.     Even though Craig Taylor, Scott Newell's accountant at the time, expressed concerns, McBride would not change his decision to enter into an agreement with Merrill Scott. Taylor did not raise any concerns about the FBAR reporting requirement. *See* (Pl. Ex. 9) (Pl. Ex. 117, Newell Dep. Tr. 36:22-37:7) (Tr. 161:9-162:14, May 21, 2012).

34.     Even though he had not obtained an outside opinion regarding the legal consequences of entering into the Master Financial Plan, McBride entered into an Implementation Agreement wherein he agreed to purchase a Master Financial Plan from Merrill Scott for $75,000, in addition to retaining their services for regular monthly fees. *See* (Pl. Ex. 13).

35.     Merrill Scott's proposed Master Financial Plan for McBride included the preparation of the income tax returns for McBride and Newell as part of the services that Merrill Scott would render. *See* (Pl. Ex. 13); *see also* (Pl. Ex. 118, Ackerson Dep. 141:12-147:8).

36.     McBride declined to retain Merrill Scott's tax return preparation services for his personal income tax returns. *See* (Tr. 268:25-26:7, May 2, 2012); (Tr. 270:18-25, May 22, 2012); (Tr. 306:19-21, May 22, 2012).

37.     McBride sent the payments for the Master Financial Plan to Merrill Scott with checks dated July 1, 1999, August 9, 1999 and December 20, 1999. *See* (Pl. Ex. 15).

38.     In the memo field for the check dated August 9, 1999, McBride indicated that the check was for "Bank account offshore." *See* (Pl. Ex. 15); (Tr. 272:9-19, May 22, 2012).

39.     On or around August 22, 1999, Craig Taylor sent McBride and Newell a memorandum that advised McBride of Taylor's concerns and questions he had regarding the Merrill Scott proposal as he understood it at the time. (Tr. 269:24-270:14, May 22, 2012); *see* (Pl. Exs. 8, 9).

40.     Attached to Taylor's letter of August 22, 1999, was a newspaper article that described that holding bank accounts in foreign countries was associated with tax evasion and fraudulent activity. *See* (Pl. Ex. 9).

41.     The newspaper article further described the illegality of a process whereby individuals would create fictitious loans that in reality consisted of their own money, while treating the loans as real in order to take deductions on the interest paid and avoid federal income taxation. *See* (Pl. Ex. 9).

42.     McBride read the letter and attached article. (Tr. 270:3-14, May 22, 2012).

43.     Taylor also composed a letter for McBride to send to Merrill Scott, asking Merrill Scott to clarify certain of its strategies with respect to the Master Financial Plan, based on Taylor's understanding of the Master Financial Plan as of August 22, 1999. The letter did not contain any reference or question regarding the reporting requirements that might be incurred by McBride. *See* (Pl. Exs. 8, 87).

**E.     McBride Executed the Merrill Scott-Designed Master Financial Plan.**

44.     Pursuant to the Master Financial Plan, McBride purchased a Foreign Variable Annuity. (Tr. 282:8-18, May 22, 2012); *see* (Pl. Exs. 12, 13).

45.     Pursuant to the Master Financial Plan, Merrill Scott made three IBCs available to McBride and Newell: Drehpunkt, Ltd. ("Drehpunkt"); Lombard & Associates, Ltd. ("Lombard"); and Palisades & Associates, Ltd. ("Palisades"). (Tr. 114:7-25, May 21, 2012)*; see* (Pl. Exs. 12, 13, 64, 69, 87).

46.     Pursuant to the Master Financial Plan, Drehpunkt, Lombard, and Palisades were each nominally controlled by officers/directors employed by or otherwise associated with Merrill Scott on behalf of McBride and Newell. (Tr. 283:8-284:18, May 22, 2012); (Pl. Exs. 12, 13, 59, 87).

47.     In order to implement the Master Financial Plan, McBride entered into an agreement or multiple agreements with Piao Shang on behalf of the Clip Company. (Tr. 118:8-119:22, May 21, 2012).

48.     Pursuant to these agreements, Piao Shang and the Clip Company agreed that the Clip Company would pay Piao Shang a higher per-unit price that included the amortized fixed cost of the molds, even though the cost of the molds had already been paid by the Clip Company. Such higher payments would result in excess funds (the "excess funds") that would have otherwise represented the profits of the Clip Company. (Tr. 276:23-277:20, May 22, 2012); (Pl. Exs. 59, 60).

49.     Instead of retaining the excess funds and reporting the difference in cost of goods sold as profit on its federal income tax returns, the Clip Company paid the excess funds to Piao Shang during the tax years 2000 and 2001. (Tr. 118:8-119:22, May 21, 2012); (Tr. 128:10-129:24, May 21, 2012).

50.     Pursuant to the agreement between Piao Shang and the Clip Company, Piao Shang remitted the excess funds to Drehpunkt, even though Drehpunkt had provided no consideration to Piao Shang for such excess funds. (Tr. 118:8-119:22, May 21, 2012); (Tr. 128:10-129:24, May 21, 2012).

51.     Drehpunkt received these excess funds via wire transfer in a bank account with the Royal Bank of Scotland, located in the Bahamas, account number XXXXXX-XX3579 (the "Drehpunkt account"). (Tr. 128:16-129:24, May 21, 2012); (Pl. Ex. 88).

52.     McBride set up the wire transfer arrangement between Piao Shang and the Drehpunkt account. (Tr. 276:23-277:20, May 22, 2012); (Pl. Ex. 60).

53.     McBride also set up a wire transfer arrangement between Vanli International (another supplier) and the Drehpunkt account. (Tr. 278:3-11, May 22, 2012).

54.     Lombard also held a bank account with the Royal Bank of Scotland, located in the Bahamas, account number XXXXXX-XX5776 (the "Lombard account"). (Tr. 186:3-15, May 21, 2012); (Tr. 283:20-284:11, May 22, 2012); (Pl. Ex. 89).

55.     Pursuant to the Master Financial Plan, Drehpunkt received and disbursed funds from Piao Shang to the Clip Company and to other entities on behalf of the Clip Company as well as McBride, individually. (Tr. 130:19-133:7, May 21, 2012).

56.     Lombard received the vast majority, if not all, of its funds from Drehpunkt via wire transfers between the Drehpunkt account and the Lombard account. (Tr. 280:7-12, May 22, 2012).

57.     The Drehpunkt account carried a balance of $310,002 in 2000. (Uncontroverted Fact No. 4); (Pl. Ex. 88, p. US02105); *see* (Tr. 109:24-110:6, May 21, 2012).

58.     The Drehpunkt account carried a balance of $736,902 in 2001. (Uncontroverted Fact No. 4); (Pl. Ex. 88, p. US02113); *see* (Tr. 110:9-24, May 21, 2012).

59.     The Lombard account carried a balance of $140,250 in 2000. (Uncontroverted Fact No. 4); (Pl. Ex. 89, p. US02088); *see* (Tr. 109:24-110:6, May 21, 2012).

60.     The Lombard account carried a balance of $150,132 in 2001. (Uncontroverted Fact No. 4); (Pl. Ex. 89, p. US02117); *see* (Tr. 110:9-24, May 21, 2012).

61.     Pursuant to the Master Financial Plan, Lombard received and disbursed funds exclusively on behalf of McBride. (Tr. 132:17-21, May 21, 2012); (Tr. 280:7-9, May 22, 2012).

62.     McBride believed and understood Drehpunkt and Lombard to be "bank accounts." (Tr. 46:8-12, May 21, 2012).

63.     During 2000 and 2001, Drehpunkt, Lombard, and Palisades were each utilized for the benefit of the Clip Company, McBride, and Newell, and no other individuals. (Tr. 281:24-282:2, May 22, 2012).

**F.    McBride Dictated the Activity and Disposition of Funds Held by Drehpunkt and Lombard.**

64.     McBride understood that persons employed by or otherwise associated with Merrill Scott were the nominee directors of Drehpunkt and Lombard. *See* (Pl. Exs. 13, 87); (Tr. 46:8-19, May 21, 2012).

65.     McBride understood that he would be able to exercise control over the funds held by Drehpunkt and Lombard. (Tr. 46:8-19, May 21, 2012); (Tr. 53:7-12, May 21, 2012); (Tr. 280:7-12, May 22, 2012).

66.     In various materials, McBride was listed as the "beneficial owner" of Drehpunkt, Lombard, and the other accounts created in connection with his Master Financial Plan. (Tr. 186:8-15, May 21, 2012); (Tr. 210:8-17, May 21, 2012); (Tr. 251:3-16, May 22, 2012).

67.     McBride considered the money in the Lombard account to be his. (Tr. 285:5-7, May 22, 2012).

68.     McBride considered the funds in the Lombard account to be used for his benefit. (Tr. 285:16-19, May 22, 2012).

69.     Pursuant to McBride's requests, employees of Merrill Scott executed wire transfers to move money to or from the Drehpunkt account and the Lombard account. (Tr. 285:20-25, May 22, 2012); (Pl. Ex. 4).

70.     McBride communicated to employees of Merrill Scott with instructions on when, how, where, and in what amounts to transfer funds to and from the Drehpunkt and Lombard accounts. (Tr. 279:3-10, May 22, 2012).

71.     Merrill Scott generated documents that memorialized some, but not all, of the wire transfer requests made by McBride. These documents contained instructions regarding the sending bank, receiving bank, intermediary bank, account numbers, routing numbers, amounts, and often the purpose for each transfer. (Pl. Ex. 118, Ackerson Dep. Tr. 29:13-18; 49:13-50:4).

72.     McBride received an accounting of the activity that was conducted with respect to the Drehpunkt account and the Lombard account approximately every two weeks from David Fraidenburg, an employee of Merrill Scott. (Tr. 49:23-50:4, May 21, 2012).

73.     Every direction to transfer funds to or from the Drehpunkt account or the Lombard account made by McBride was either honored by the employees of Merrill Scott or McBride withdrew the request before Merrill Scott could fail to honor the request. (Tr. 87:2-6, May 21, 2012); (Tr. 114:5-116:7, May 21, 2012).

74.     On several occasions, employees of Merrill Scott asked for McBride's authorization or explicit instructions before transferring funds to and from the Drehpunkt account and the Lombard account. *See, e.g.,* (Pl. Exs. 19, 64, 68).

75.     Whether by telephone, facsimile, or email message, McBride directed employees of Merrill Scott to make several wire transfers to or from the Drehpunkt account and the Lombard account on his behalf or on the behalf of the Clip Company. *See* (Pl. Ex. 19-55, 63-69, 95-115).

**G.     McBride Funneled Profits of the Clip Company Through Its Taiwanese Manufacturer to his IBCs and Back to Himself Through a Sham Line of Credit.**

76.     Approximately $2.7 million in excess funds, which would have otherwise represented the profits of the Clip Company, were circuitously funneled through various foreign entities, including Drehpunkt and Lombard. (Tr. 109:19-23, May 21, 2012); (Tr. 118:23-119:22,

May 21, 2012); (Tr. 128:10-132:12, May 21, 2012); (Tr. 274:25-275:12, May 22, 2012); (Tr. 276:12-278:25, May 22, 2012); (Tr. 277:5-278:18, May 22, 2012); (Pl. Exs. 82, 83, 84, 86).

77.     Commencing on or around November 16, 1999, and continuing through December 6, 2001, at least $1.8 million was transferred from the Drehpunkt account to Fidelity Funding, Ltd., an entity controlled by Merrill Scott, and subsequently to Legacy Capital, another entity controlled by Merrill Scott. That money funded a "loan" from the Merrill Scott-controlled entities to the Clip Company in the form of a line of credit. (Tr. 53:3-6, May 21, 2012); (Tr. 118:23-119:22, May 21, 2012); (Tr. 128:10-132:12, May 21, 2012); (Pl. Exs. 66, 67, 82, 83, 84, 86).

78.     During 2000 and 2001, the Clip Company "borrowed" more than $1.2 million dollars against this line of credit and only repaid a fraction of the principal and interest. (Pl. Ex. 118, Ackerson Dep. Tr. 156:1-158:23); (Pl. Ex. 16).

79.     The Clip Company borrowed its own money from the line of credit. (Tr. 279:14-16, May 22, 2012).

80.     The Clip Company treated the line of credit as a loan for tax purposes. (Tr. 128:20-129:9, May 21, 2012); (Tr. 152:13-154:1, May 21, 2012); (Tr. 282:22-283:7); (Tr. 309:14-20, May 22, 2012).

81.     The Clip Company used the proceeds of the line of credit to pay regular business expenses. (Tr. 279:18-21, May 22, 2012).

82.     McBride made several draws on the line of credit on behalf of the Clip Company. (Tr. 278:19-279:21, May 22, 2012).

83.     Whenever the Clip Company reached the maximum amount allotted to the line of credit, Merrill Scott employees would raise the limit and again honor the requested draw on the line of credit. (Tr. 278:19-279:21, May 22, 2012).

84.     Hundreds of thousands of dollars of this "borrowed" money was distributed to McBride and Newell in the form of "partner draws" which were accounted for as "royalty payments." (Tr. 279:22-280:2, May 22, 2012).

85.     Neither Piao Shang nor Vanli International ever received any payments on the line of credit. (Tr. 152:8-14, May 21, 2012); (Tr. 281:24-282:2).

**H.     McBride Used the Profits of the Clip Company Captured by Drehpunkt and Lombard for His Own Benefit.**

86.     McBride gave instructions to Merrill Scott employees to wire funds from the Drehpunkt account or the Lombard account to his designated recipient on multiple occasions during 2000 and 2001. *See* (Pl. Exs. 19-55, 63-69, 95-115).

87.     On or around January 19, 2000, McBride directed Merrill Scott employees to transfer $141,900 to fund a mortgage for McBride's former wife. (Tr. 49:6-12, May 21, 2012); (Tr. 294:25-295:12, May 22, 2012); s*ee* (Pl. Ex. 22).

88.     On or around December 20, 2000, McBride directed Merrill Scott employees to transfer $5,000 from the Lombard account to Brandon Carver, a neighbor of McBride's parents. That money was used by Carver to purchase Christmas presents for McBride's parents. (Tr. 124:20-125:10, May 21, 2012); (Pl. Ex. 27).

89.     On or around September 1, 2000, McBride directed Merrill Scott employees to transfer $35,000 from the Lombard account to Court L. Armstrong. McBride directed that these funds be paid to Mr. Armstrong in consideration of airline travel provided by Mr. Armstrong for McBride's benefit. (Pl. Ex. 25); (Tr. 290:18-291:10, May 22, 2012).

90.     McBride entered into two automobile leases with Merrill Scott Leasing, an entity controlled by Merrill Scott, using funds held in the Lombard account. (Tr. 49:6-12, May 21, 2012); (Tr. 293:23-294:21, May 22, 2012); (Pl. Exs. 4, 31, 32).

91.     McBride directed employees of Merrill Scott to make a direct investment in GEET, International using funds from the Lombard account in the amount of $50,000. (Tr. 49:6-12, May 21, 2012); (Tr. 293:5-13, May 22, 2012); (Pl. Exs. 4, 29).

92.     Employees of Merrill Scott transferred $50,000 from the Lombard account to GEET, International on McBride's behalf and as an investment for McBride. (Pl. Ex. 29)

93.     McBride personally entered into a retainer agreement with attorney William Gregory Burdett to sue the principals of GEET International. (Tr. 293:2-22, May 22, 2012); (Pl. Exs. 4, 29).

94.     McBride directed that Mr. Burdett's fees be paid from the Lombard account. (Tr. 293:2-22, May 22, 2012); (Pl. Exs. 4, 29).

95.     McBride also directed employees of Merrill Scott to make a direct investment in Choice Sports Network in the amount of $50,000. (Pl. Exs. 23, 63).

96.     Employees of Merrill Scott transferred $50,000 from the Lombard account to Choice Sports Network on McBride's behalf and as an investment for McBride. (Pl. Ex. 26).

97.     McBride also directed employees of Merrill Scott to make a direct investment in ICUNET, Inc. in the amount of $50,000. (Tr. 292:4-9, May 22, 2012); (Pl. Exs. 4, 26).

98.     Employees of Merrill Scott transferred $50,000 from the Lombard account to ICUNET, Inc. on McBride's behalf and as an investment for McBride. (Pl. Ex. 26).

99.     McBride directed Merrill Scott employees to transfer $51,000 from the Drehpunkt account, $7,000 from the Lombard account, and $59,000 from Palisades for a total of $117,000 to the Clip Company. (Pl. Exs. 19, 33).

**I.      McBride Directed Employees of Merrill Scott to Create Other Accounts to Hold His Assets.**

100.    Among McBride's several requests were that Merrill Scott establish brokerage accounts so that he could purchase securities and make other investments with the funds that were held by Lombard. (Tr. 303:13-20, May 22, 2012); (Tr. 304:8-306:5, May 22, 2012); (Pl. Exs. 17, 24, 30, 61, 62).

101.    Pursuant to McBride's request, a TD Evergreen Wealth Management/Toronto Dominion Bank (Canada) brokerage account number XX1350 (the "TD Evergreen account") was established and held in the name of Phoenix Overseas Advisors, Ltd. ("POA"). (Tr. 50:5-12, May 21, 2012); (Tr. 51:8-18, May 21, 2012); (Tr. 112:18-113:16, May 21, 2012); *see* (Pl. Exs. 20, 61, 91).

102.    The TD Evergreen account was located in Canada. *See* (Pl. Ex. 91).

103.    POA was an entity controlled by Merrill Scott, used to invest its clients' funds in brokerage accounts, such as TD Evergreen Wealth Management/Toronto Dominion Bank. (Tr. 133:11-21, May 21, 2012); (Tr. 181:4-20, May 21, 2012); (Tr. 296:2-15, May 22, 2012); (Pl. Ex. 118, Ackerson Dep. Tr. 49:13-50:4); *see* (Pl. Exs. 20, 61, 68).

104.    McBride directed employees of Merrill Scott as to which securities should be purchased by POA and held in the TD Evergreen account. (Tr. 49:19-50:23, May 21, 2012); (Tr. 86:21-87:1, May 21, 2012); *see* (Pl. Ex. 68).

105.    The amounts that were transferred into the TD Evergreen account from POA were consistent with amounts transferred from the Lombard account to POA. (Tr. 249:6-18, May 22,

2012); (Tr. 254:14-255:8, May 22, 2012); (Tr. 254:14-255:8, May 22, 2012); (Pl. Ex. 118, Ackerson Dep. 169:25-170:12).

106.    Whenever McBride directed that an investment be made in blue chip stocks, these stocks were purchased and held in the TD Evergreen account. (Tr. 255:9-256:6, May 22, 2012).

107.    McBride also had an E*Trade account with a portfolio of stocks and securities he managed himself. (Tr. 255:9-15, May 22, 2012).

108.    The stock purchases in the TD Evergreen account and in McBride's E*Trade portfolio were consistent with respect to which securities were purchased and when the securities were purchased. (Tr. 255:9-256:6, May 22, 2012).

109.    The TD Evergreen account carried a balance of $39,507.22 in 2000. (Tr. 112:17-113:16, May 21, 2012); (Pl. Ex. 91, p. H&H02282); (Def. Exs. 27, 28).

110.    The TD Evergreen account carried a balance of $10,899.63 in 2001. (Tr. 252:19-253:23, May 22, 2012); (Def. Ex. 28, p. H&H02289).

111.    Pursuant to McBride's request, a Global Securities Corporation (Canada) brokerage account was established and held in the name of Lombard & Associates, Ltd., c/o Merrill Scott & Associates, account number XXX-308U-0 (the "Global Securities account"). (Tr. 111:20-112:18, May 21, 2012); (Tr. 134:8-23, May 21, 2012); (Tr. 183:8-15, May 21, 2012); *see* (Pl. Exs. 17, 18, 90, 116).

112.    The Global Securities account was located in Canada. *See* (Pl. Exs. 17, 18).

113.    The Global Securities account carried a balance of $299,977 in 2000. *See* (Pl. Ex. 90, p. H&H01063).

114.    The Global Securities account carried a balance of $308,377 in 2001. *See* (Pl. Ex. 90., p. H&H01060).

115.    McBride was aware that his assets were being handled by Mark Stern, who worked for Global Securities. (Tr. 134:8-23, May 21, 2012); (Tr. 246:10-21, May 22, 2012); (Pl. Ex. 17); *see* (Pl. Ex. 71 at ¶ 13).

**J.    McBride Pulled His Assets Out of Merrill Scott in Mid-2001.**

116.    McBride stopped receiving biweekly spreadsheets reflecting the status of his assets in the foreign accounts sometime in early 2001. (Tr. 336:3-6, May 22, 2012).

117.    McBride also stopped receiving billing statements for interest payments on the line of credit sometime around early 2001. (Tr. 336:7-12, May 22, 2012).

118.    McBride was concerned about the legitimacy of Merrill Scott no later than March of 2001. (Tr. 339:11-14, May 22, 2012).

119.    McBride convinced Merrill Scott employees to increase the amount of the line of credit by $665,000. He then immediately withdrew all those funds from the line of credit on March 2, 2001. (Tr. 339:1-10, May 22, 2012); (Pl. Ex. 86).

120.    McBride filed a claim with a receiver appointed to administer Merrill Scott, stating that he had an interest in both Drehpunkt and Lombard. (Pl. Ex. 81); *see* (Tr. 152:15-153:16, May 21, 2012).

**K.    McBride Did Not File an FBAR Report for the Tax Years 2000 and 2001.**

121.    In 2000 and 2001, McBride knew that the Drehpunkt account, the Lombard account, the TD Evergreen account, and the Global Securities account, (collectively, the "foreign accounts"), were located in countries outside of the United States. (Tr. 274:1-6, May 22, 2012); (Tr. 276:16-22, May 22, 2012); (Tr. 283:20-25, May 22, 2012); (Pl. Exs. 17, 18, 91).

122.    For all relevant periods prior to the filing of his 2001 federal income tax return, McBride's personal accountant was Craig Stayner ("Stayner"). (Tr. 204:12-15, May 21, 2012); (Tr. 268:25-269:7, May 2, 2012); (Tr. 270:18-25, May 22, 2012); (Tr. 310:16-22, May 22, 2012).

123.   Stayner was also the accountant who prepared the federal tax returns for the Clip Company. (Tr. 270:18-25, May 22, 2012); (Tr. 306:11-13, May 22, 2012).

124.   McBride never discussed his involvement with Merrill Scott with Stayner. (Tr. 270:18-25, May 22, 2012).

125.   McBride never informed Stayner of either the TD Evergreen account or the Global Securities account. (Tr. 306:11-18, May 22, 2012).

126.   No other person assisted McBride in the preparation of his federal tax returns for the tax year 2000. (Tr. 268:25-269:7, May 22, 2012).

127.   McBride was the sole source of information used by Stayner in preparing McBride's personal federal tax return for the year 2000. (Tr. 360:6-21, May 22, 2012).

128.   McBride prepared and sent Stayner statements of his financial affairs for the year, and informed him what deductions McBride sought to take. (Tr. 360:14-17, May 22, 2012).

129.   McBride checked to see that Stayner accurately included at least some of the information he transmitted to Stayner on the schedules to the Form 1040. (Tr. 360:17-21, May 22, 2012).

130.   For the tax year 2001, Taylor prepared McBride's personal federal income tax return. (Tr. 306:19-21, May 22, 2012).

131.   On McBride's U.S. Individual Income Tax Return (Form 1040) for the tax year 2000, Schedule B, Line 7a contained the following question/instruction: "At any time during 2000, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See instructions for exceptions and filing requirements for Form TD F 90-22.1" (Pl. Ex. 56).

132.     On McBride's Form 1040 Schedule B for the tax year 2000, on Line 7a, the "No" box is filled. (Pl. Ex. 56).

133.     On his federal income tax return (Form 1040) for the tax year 2000, McBride did not report that he had an interest in any foreign bank or financial account. (Tr. 310:23-311:3, May 22, 2012); *see* (Pl. Ex. 56).

134.     McBride did not complete or file a Form TD F 90-22.1 for the tax year 2000. (Tr. 311:4-7, May 22, 2012).

135.     The Form 1040 U.S. Individual Income Tax Return for the tax year 2000 signed by McBride contains the following declaration immediately above the signature line: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge." (Pl. Ex. 56, p. 2).

136.     On McBride's U.S. Individual Income Tax Return (Form 1040) for the tax year 2001, Schedule B, Line 7a contained the following question/instruction: "At any time during 2001, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See instructions for exceptions and filing requirements for Form TD F 90-22.1" (Pl. Ex. 57).

137.     On McBride's Form 1040 Schedule B for the tax year 2001, on Line 7a, the "No" box is filled. (Pl. Ex. 57).

138.     On his federal income tax return (Form 1040) for the tax year 2001, McBride did not report that he had an interest in any foreign bank or financial account. (Tr. 312:1-7, May 22, 2012); *see* (Pl. Ex. 57).

139.    McBride did not complete or file a Form TD F 90-22.1 for the tax year 2001. (Tr. 312:4-7, May 22, 2012).

140.    The Form 1040 U.S. Individual Income Tax Return for the tax year 2001 signed by McBride contains the following declaration immediately above the signature line: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge." (Pl. Ex. 57, p. 2).

141.    McBride signed his Form 1040 U.S. Individual Income Tax Returns for the tax years 2000 and 2001. (Pl. Exs. 56, 57).

**L.    McBride Never Obtained a Legal Opinion Regarding the Consequences of Engaging in Merrill Scott's Master Financial Plan.**

142.    On December 10, 2009, McBride stated, under penalty of perjury, that he "reviewed and considered all [Merrill Scott]-based literature and marketing information, including its 'due diligence' information on each of its officers and its track record pertaining to being in 'good standing' with Utah. This information includes (but is not all-inclusive) . . . the legal opinion included as part of McBride's initial disclosures, and the packet of [Merrill Scott] literature . . ." (Pl. Ex. 3, Response 6).

143.    At trial, McBride contradicted that statement and testified that he did not read the legal opinion that was provided to him by the Estate Planning Institute, a Merrill Scott-controlled entity. (Tr. 402:9-16, May 22, 2012).

144.    McBride never obtained an outside legal opinion from an attorney about his reporting or tax obligations under the Master Financial Plan. (Tr. 271:11, May 22, 2012).

145.    Even though McBride was "concerned" about Merrill Scott no later than March, 2001, McBride did not discuss his involvement with Merrill Scott with Stayner, his accountant, in connection with the preparation of his federal income tax return, which Stayner signed and dated April 6, 2001, and McBride signed and dated April 14, 2001. (Tr. 270:18-22, May 22, 2012); (Tr. 392:10-20, May 22, 2012); (Pl. Ex. 56).

146.    McBride never sought advice from Stayner on the legality of the strategies contemplated by the Master Financial Plan or otherwise employed by Merrill Scott. (Tr. 392:10-20, May 22, 2012).

147.    McBride never provided Stayner any of the promotional or informational materials provided to him by Merrill Scott. (Tr. 270:18-25, May 22, 2012); (Tr. 392:10-20, May 22, 2012).

148.    McBride never informed his accountant, Craig Stayner, of his involvement with Merrill Scott in connection with the preparation of the Clip Company's tax returns for 2000. (Tr. 270:23-25, May 22, 2012); (Pl. Ex. 3, Response 4).

149.    McBride did not discuss his involvement with Merrill Scott with Stayner because he "thought that was the purpose of Merrill Scott because . . . if you disclose the accounts on the form, then you pay tax on them, so it went against what [he] set up Merrill Scott for in the first place." (Tr. 392:13-29, May 22, 2012).

150.    McBride did not tell or otherwise inform Craig Stayner that Craig Taylor may have relevant information or expertise regarding McBride's tax and reporting obligations as a result of entering into a Master Financial Plan with Merrill Scott. (Tr. 270:18-22, May 22, 2012); (Tr. 392:10-20, May 22, 2012).

151.   McBride sent the materials provided to him by Merrill Scott to Newell's accountant, Craig Taylor ("Taylor"), in or around July, 1999. (Tr. 322:18-323:2, May 22, 2012).

152.   Taylor declared, under penalty of perjury, that he only used the information provided to him by McBride in order to prepare McBride's federal income tax returns. (Pl. Ex. 8, ¶ 2). Taylor also stated that McBride never informed him that he had any foreign bank accounts. (Pl. Ex. 8, ¶ 6).

**M.   McBride Lied to the IRS and the United States in Order to Hide his Ownership and Financial Interest in the Foreign Accounts.**

153.   Beginning in 2004, the IRS began to investigate McBride for potential issues related to his federal income tax returns as a result of his participation in Merrill Scott programs. (Tr. 92:22-93:2, May 21, 2012).

154.   The IRS determined that McBride worked with Merrill Scott to set up an offshore business structure to move domestic profits of the Clip Company offshore by inflating the costs of inventory paid to Piao Shang and retaining the excess funds in foreign financial accounts. (Tr. 95:19-96:7, May 21, 2012); (Pl. Ex. 13).

155.   Over the course of the examination, the IRS repeatedly requested that McBride produce various documents related to his participation in Merrill Scott programs. (Tr. 103:21-25, May 21, 2012).

156.   Initially, McBride did not produce any emails, letters, or handwritten notes in response to the IRS's document requests. (Tr. 148:4-21, May 21, 2012).

157.   In interviews with the IRS, McBride denied that he had utilized the programs described in the Master Financial Plan with offshore components. (Tr. 106:23-107:5, May 21, 2012).

158.     In interviews with the IRS, McBride lied to the IRS, and denied knowledge of any wire transfer from the Drehpunkt account or the Lombard account. (Tr. 107:9-17, May 21, 2012); (Tr. 309:21-310:1, May 22, 2012).

159.     In interviews with the IRS, McBride lied to the IRS, and claimed that the money funneled from Piao Shang through Fidelity Funding and Legacy Capital to the Clip Company constituted a valid loan from Piao Shang, as opposed to the profits of the Clip Company. (Tr. 309:14-20, May 22, 2012).

160.     In interviews with the IRS, McBride lied to the IRS, and denied knowing Brandon Carver. (Tr. 124:20-125:24, May 21, 2012); (Tr. 310:2-6, May 22, 2012).

161.     In interviews with the IRS, McBride lied to the IRS, and denied knowing Court Armstrong. (Tr. 310:7-11, May 22, 2012).

162.     In the course of its examination, the IRS requested the McBride file an FBAR report, Form TD F 90-22.1 for the tax years 2000 and 2001, but McBride did not do so. (Tr. 158:5-14, May 21, 2012).

163.     As a result of McBride's failure to comply with the FBAR requirements for the tax year 2000, the IRS assessed McBride with a civil penalty assessment in the amount of $100,000 ($25,000 per account) for his willful failure to report his interest in the foreign accounts as required by 31 U.S.C. § 5314. (Pl. Ex. 1).

164.     As a result of McBride's failure to comply with the FBAR requirements for the tax year 2001, the IRS assessed McBride with a civil penalty assessment in the amount of $100,000 ($25,000 per account) for his willful failure to report his interest in the foreign accounts as required by 31 U.S.C. § 5314. (Pl. Ex. 2).

## CONCLUSIONS OF LAW

### I.    STATUTORY FRAMEWORK

Section 5314(a) authorizes the Secretary of the Treasury to require that U.S. citizens report when they "make[] a transaction or maintain[] a relation for any person with a foreign financial agency."  31 U.S.C. § 5314(a) (2001).  The Secretary has exercised that authority, and requires that individuals "having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country shall report such relationship . . . for each year in which such relationship exists," 31 C.F.R. § 103.24(a) (2001), but only "with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." 31 C.F.R. § 103.27(c) (2001).[2]  The Secretary may impose penalties upon taxpayers that violate this requirement.  31 U.S.C. § 5321(a)(5) (2001).  As it existed during the years at issue, prior to an amendment that took effect in 2004, Section 5321(a)(5) authorized penalties against taxpayers who "willfully" violated Section 5314, in the amount of $25,000, or the value of the unreported account (not to exceed $100,000).  *See also* 31 C.F.R. § 103.57(g)(2) (2001).

Thus, in order to prevail, the United States must satisfy the following elements: (a) McBride was a citizen of the United States, or a resident or a person doing business in the United States during 2000 and 2001; (b) McBride had a financial interest in, or signatory or other authority over, a bank, securities or other financial account during 2000 and 2001; (c) the bank, securities or other financial account had a balance that exceeded $10,000 during 2000 and 2001; (d) the bank, securities or other financial account was in a foreign country; (e) McBride failed to

---

[2]  The Secretary implemented the regulatory requirements with a two-step reporting process.  Form 1040, Schedule B, Part III instructs taxpayers to indicate an interest in a financial account in a foreign county by checking "Yes" or "No" in the appropriate box.  *See* Uncontroverted Fact No. 8.  Form 1040 further refers taxpayers to Form TD F 90-22.1 which provides specific instructions for reporting a financial interest in or authority over bank accounts, securities accounts, or other financial accounts in a foreign country.  *See* Uncontroverted Fact No. 9.

disclose the bank, securities or other financial account; (f) the failure to report was willful; and

(g) the amounts of the penalties were proper.

## II.     BURDEN OF PROOF

The statute at issue, 31 U.S.C. § 5321(b)(2), permits the Secretary of Treasury to

"commence a civil action to recover a civil penalty assessed under subsection (a) . . . ."  The

statute does not specify the legal standard to be applied by courts in such an action.  The one

district court that has directly addressed the question of the burden of proof in a civil FBAR

penalty case, *United States v. Williams*, concluded that the United States' burden of proof was

"the preponderance of the evidence" on all questions before the court, including the question of

whether the taxpayer's failure to report in that case was "willful."  *United States v. Williams*, No.

1:09-cv-437, 2010 WL 3473311 (E.D. Va. Sep. 1, 2010), *rev'd on other grounds*, *United States*

*v. Williams*, No. 10-2230, 2012 WL 2948567 (4th Cir. Jul. 20, 2012). "In enforcement actions

brought by the Government in other contexts, . . . the Government is required to prove its case by

a preponderance of the evidence on the record established at trial." *Id*. at *1 (internal citations

omitted)). In addition, the district court in *Williams* held that "[t]he Court's review is '*de novo*,

and the general rule is that it is a decision based on the merits of the case and not on any record

developed at the administrative level.'" *Id.* (quoting *Eren v. Comm'r*, 180 F.3d 594 (4th Cir.

1999)).

The preponderance of the evidence standard applied by the district court in *Williams* is

the correct standard.  As with Government penalty enforcement and collection cases generally,

absent a statute that prescribes the burden of proof, imposition of a higher burden of proof is

warranted only where "particularly important individual interests or rights," are at stake. *See*

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983); *Grogan v. Garner*, 498 U.S. 279,

286 (1991). Because the FBAR penalties at issue in this case only involve money, it does not

involve "particularly important individual interests or rights" as that phrase is used in *Huddleston*

and *Grogan*. In *Huddleston*, the court of appeals had reversed the district court, stating that the

district court's application of the preponderance-of-the-evidence standard in connection with a

fraudulent misrepresentation case was incorrect and that a "clear and convincing evidence"

standard should have applied in connection with allegations of fraud. 459 U.S. at 379.  The

Supreme Court reversed, stating that the applicable burden was merely a preponderance of the

evidence in cases, even where allegations of fraud were involved, unless "particularly important

individual interests or rights are at stake." *Id*. at 390.

> By contrast, imposition of even severe civil sanctions that do not implicate such
> interests has been permitted after proof by a preponderance of the evidence. *See*,
> *e.g., United States v. Regan*, 232 U.S. 37, 48-49 (1914) (proof by a preponderance
> of the evidence suffices in civil suits involving proof of acts that expose a party to
> a criminal prosecution).

*Id*. at 389-90. *United States v. Regan* held that, at least where the Government is suing to recover

a monetary penalty (as is the case here), its suit is a "civil action" to be "conducted and

determined according to the same rules and with the same incidents as are other civil actions."

232 U.S. at 46-47.  The logic of *Huddleston* has been applied in the civil tax-penalty area. *See*,

*e.g., Mattingly v. United States*, 924 F.2d 785, 787 (8th Cir. 1991) ("The standard of proof in

these [civil tax violation] cases is usually a preponderance of the evidence, and by statute the

burden of proof is often placed on the government.").

Moreover, the Supreme Court has been unwilling to require that litigants meet a higher

burden of proof than the preponderance of the evidence standard where the statute does not

specify a higher burden of proof. *See Grogan*, 498 U.S. at 286 ("The language of [the statute]

does not prescribe the standard of proof . . . . This silence is inconsistent with the view that

Congress intended to require a special, heightened standard of proof."). With respect to 31 U.S.C. §§ 5314 and 5321, Congress did not specify any special, heightened standard of proof. As a result, there is no reason to deviate from the default burden of proof applicable in civil cases.

Therefore, the United States bears the burden of proving that McBride willfully failed to file FBARs with respect to the accounts at issue by the preponderance of the evidence.

### III.   THE UNITED STATES HAS PROVEN, BY A PREPONDERANCE OF THE EVIDENCE, EACH OF THE ELEMENTS OF THE ASSESSED CIVIL FBAR PENALTIES.

#### a.   Jon McBride is a citizen of the United States.

There is no dispute that Jon McBride is a citizen of the United States.  Findings of Fact, *supra*, ("FOF"), ¶ 1.

#### b.   Jon McBride had a financial interest in the accounts at issue.

McBride had a "financial interest" in the Drehpunkt, Lombard, TD Evergreen, and Global Securities accounts. Pursuant to 31 C.F.R. § 103.24(a) (2001), individuals must disclose "a financial interest in, or signature or other authority over, a bank, securities or other financial account."  The Drehpunkt and Lombard accounts were bank accounts, and the TD Evergreen and Global Securities accounts were securities accounts.  FOF, ¶ 51, 54, 101, 111. Unfortunately, Section 103.24(a) does not clarify what constitutes a "financial interest."

IRS Form TD F 90-22.1 (the form used for reporting interests in foreign financial accounts) states that an individual has a reportable "financial interest" in foreign accounts for which he "is the owner of record" or for which "the owner of record or holder of legal title is: (a) a person acting as an agent, nominee, attorney, or in some other capacity on behalf of the [individual]; (b) a corporation in which the United States person owns directly or indirectly more than 50 percent of the total value of shares of stock; [. . .] or (d) a trust in which the United States

person either has a present beneficial interest in more than 50 percent of the assets or from which such person receives more than 50 percent of the current income." *See* Form TD F 90-22.1, (Plaintiff's Ex. No. 1; Uncontroverted Fact No. 9). This language captures a broad range of relationships through which a party may maintain an interest in a foreign financial account and is consistent with more recent regulation.[3]

Under this definition, McBride had a financial interest in each of the four foreign accounts at issue.  The accounts were treated by Merrill Scott as "McBride's" accounts — as reflected on the documentation and communications related to those accounts and McBride's understanding and expectation as well as the course of dealing with Merrill Scott — and McBride had the expectation of enjoying the benefit of the assets in the accounts. FOF, ¶¶ 62, 64, 65.  The documentation related to the foreign accounts shows that persons or entities employed by or otherwise associated with Merrill Scott would act on behalf of McBride as nominee officers/directors of IBCs or as the nominee holders of the accounts. FOF, ¶¶ 11, 45, 46, 64, 101, 103, 104, 111.

Through this deliberately disguised ownership structure, McBride was able to direct Merrill Scott to use the overpayments and profits — that would have otherwise flowed to the Clip Company but were instead captured overseas in the Drehpunkt and Lombard accounts — in whatever way he saw fit. FOF, ¶¶ 64-75, 86-115.  Given McBride's tacit ownership of the value held in these accounts, Drehpunkt and Lombard were each a "corporation in which [McBride] own[ed] directly or indirectly more than 50 percent of the total value of shares of stock." McBride was then able to direct Merrill Scott to repatriate the Clip Company's overpayments by

---

[3] 31 C.F.R. § 1010.350(e)(2)-(3) (2011) essentially adopts the definitions of "financial interest" used in Form TD F 90-22.1 and indicates that "financial interest" is intended to reach a situation where entities are used to disguise the taxpayer's interest in foreign accounts.

funneling them through Drehpunkt back to the Clip Company disguised as a "line of credit" from Legacy Capital, an entity controlled by Merrill Scott. *See* FOF, ¶¶ 76-85; (*See* Uncontroverted Fact No. 5). During 2000 and 2001, the Clip Company "borrowed" more than $1.2 million dollars of its own money and only repaid a fraction of the principal and interest. FOF, ¶¶ 78-81. Hundreds of thousands of dollars of this "borrowed" money was then distributed directly to McBride in the form of "partner draws" which were accounted for as "royalty payments." FOF, ¶ 84. McBride acted as though the assets contained in each of the foreign accounts, as well as the line of credit, were his and were maintained for his benefit. FOF, ¶¶ 45, 46, 62-75, 84, 86-115.

McBride was able to exercise substantial control over the Drehpunkt and Lombard accounts by communicating with Merrill Scott employees and instructing them on how to dispose of the assets, whether that disposition was to fund an investment or transfer the funds. FOF, ¶¶ 63-75, 86-115. These transfers were initiated at the request of McBride, and normally made exclusively for his own benefit without any possible business purpose for either Drehpunkt or Lombard (or Merrill Scott for that matter). FOF, ¶¶ 86-99. Not one of McBride's requests to transfer funds was ever denied by the employees of Merrill Scott. FOF, ¶ 73. In many instances, employees of Merrill Scott requested explicit authorization and instructions from McBride in order to dispose of the funds in the foreign accounts. FOF, ¶ 74. Through Merrill Scott and its affiliate, McBride was also able to establish the TD Evergreen account and the Global Securities account (held in the name of Lombard & Associates, Ltd.) and to direct the securities purchased and held in those accounts for McBride's benefit. FOF, ¶¶ 100-115. Although the money used to fund the TD Evergreen securities account was apparently routed through POA (which held money on behalf of many other Merrill Scott clients), the securities in both the TD Evergreen

and Global Securities accounts were purchased at McBride's direction and were held on his behalf. FOR, ¶¶ 100, 105-108, 111.

The evidence thus demonstrates that there was an agency relationship between McBride and Merrill Scott through which McBride owned and controlled the Drehpunkt, Lombard, TD Evergreen, and Global Securities accounts. Accordingly, Mr. McBride's interest in the Drehpunkt, Lombard, TD Evergreen, and Global Securities accounts rises to the level of a financial interest that triggered the FBAR reporting requirements.

### c. The foreign accounts were located outside of the United States.

The four foreign accounts at issue in this case were located in countries outside the United States. FOF ¶¶ 51, 54, 101, 111, Uncontroverted Fact No. 6.

### d. The foreign accounts each had a balance that exceeded $10,000 in both 2000 and 2001.

The foreign bank accounts at issue had balances of at least $10,000 in 2000 and 2001 as demonstrated by statements issued for those accounts as well as the investigation by the IRS that traced the flow of funds from Piao Shang through the Drehpunkt account, the Lombard account, the TD Evergreen account, and the Global Securities account. FOF, ¶¶ 57-60, 109, 110, 113, 114.

### e. McBride failed to disclose the foreign accounts in accordance with the FBAR requirements.

McBride filed U.S. Individual Income Tax Returns for both the tax years 2000 and 2001, which did not disclose any interest in any of the foreign accounts. FOF, ¶¶ 132, 137. McBride did not file a Form TD F 90-22.1 for either of the tax years 2000 or 2001. FOF, ¶¶ 134, 139.

### f.   McBride's Failure to Report His Interest in the Foreign Accounts was Willful.

Section 5321(a)(5) does not define how to assess whether an individual acted willfully in his failure to comply with the reporting requirements imposed by § 5314. "'[W]illfully' is a 'word of many meanings whose construction is often dependent on the context in which it appears.'" *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2004) (quoting *Bryan v. United States*, 524 U.S. 184, 191 (1998)).

Because § 5321(a)(5) involves civil penalties, the applicable definition of willfulness is that which has been used in other civil contexts, including civil tax collection matters and compliance with reporting requirements. Where willfulness is a condition of civil liability, it covers "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co.*, 551 U.S. at 57; *cf. United States v. Illinois Central R. Co.*, 303 U.S. 239, 242-43 (1938) ("willfully" includes "conduct marked by careless disregard whether or not one has the right to so act") (citation omitted). Therefore, "willfulness" may be satisfied by establishing the individual's reckless disregard of a statutory duty, as opposed to acts that are known to violate the statutory duty at issue. *See Safeco Ins. Co.*, 551 U.S. at 57.  An improper motive or bad purpose is not necessary to establish willfulness in the civil context. *Am. Arms Int'l v. Herbert*, 563 F.3d 78, 83 (4th Cir. 2009); *Prino v. Simon*, 606 F.2d 449, 451 (4th Cir. 1979).

The Supreme Court recently confirmed that acting with "willful blindness" to the obvious or known consequences of one's action also satisfies a willfulness requirement in both civil and criminal contexts. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-69 (2011) ("persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts") (citing *United States v. Jewell*, 532 F.2d 697, 700 (9th Cir. 1976) (*en banc*)). Under the "willful blindness" standard, "a willfully blind defendant is one

who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id*. at 2070-71. Where a taxpayer makes a "conscious effort to avoid learning about reporting requirements," evidence of such willful blindness is a sufficient basis to establish willfulness. *United States v. Williams*, Case No. 10-2230, 2012 WL 2948569, at *4 (4th Cir. Jul. 20, 2012) (internal quotations omitted).

In civil contexts involving a requirement to report or disclose certain information to the IRS, willfulness has been defined as conduct which is voluntary, rather than accidental or unconscious. *Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997) (defining "willfulness" in the context of a civil penalty for willfully failing to disclose required information to the IRS as conduct that "requires only that a party act voluntarily in withholding requested information, rather than accidentally or unconsciously."); *accord Denbo v. United States*, 988 F.2d 1029, 1034-35 (10th Cir. 1993) (defining "willful" conduct as a "voluntary, conscious and intentional decision") (quoting *Burden v. United States*, 486 F.2d 302, 304 (10th Cir. 1973), *cert. denied*, 416 U.S. 904 (1974)). Conduct that evidences "reckless disregard of a known or obvious risk" or a "failure to investigate . . .  after being notified [of the violation]" also satisfies the civil standard for willfulness in such contexts. *Denbo*, 988 F.2d at 1033.

Willfulness may also "be proven through inference from conduct meant to conceal or mislead sources of income or other financial information."  *United States v. Sturman*, 951 F.2d 1466, 1476-77 (6th Cir. 1991). Moreover, willful intent may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. *See id.* (citing *Spies v. United States*, 317 U.S. 492, 499 (1943)).

1.    **McBride Had Knowledge of the Duty to Comply with the FBAR Requirements.**

McBride was aware that he was engaged in a plan to avoid income taxes by hiding his interest in assets in overseas shell corporations.  FOF, ¶¶ 16-20, 44-63. Concomitant with this intention is his willfulness with respect to whether or not he complied with the FBAR filing requirements. McBride was "gung ho" about retaining Merrill Scott to assist in avoiding the payment of his income taxes, FOF, ¶ 32, and he was similarly willful with respect to the FBAR filing requirement. After all, McBride reasoned, "that was the purpose of Merrill Scott because . . . if you disclose the accounts on the form, then you pay tax on them, so it went against what [he] set up Merrill Scott for in the first place." FOF, ¶ 149.

A.    **Constructive Knowledge of the Reporting Requirement Is Imputed to Taxpayers Who Sign Their Federal Tax Returns.**

All persons in the United States are charged with knowledge of the Statutes-at-Large. *Jones v. United States*, 121 F.3d 1327 (9th Cir. 1997) (citing *Bollow v. Federal Reserve Bank*, 650 F.2d 1093, 1100 (9th Cir.1981)). It is well established that taxpayers are charged with the knowledge, awareness, and responsibility for their tax returns, signed under penalties of perjury, and submitted to the IRS.  *Magill v. Comm'r*, 70 T.C. 465, 479-80 (1978), *aff'd*, 651 F.2d 1233 (6th Cir. 1981); *Teschner v. Comm'r*, T.C. Memo. 1997-498, *17 (1997); *accord United States v. Overholt*, 307 F.3d 1231, 1245-46 (10th Cir. 2002) (observing that in *Bryan v. United States*, 524 U.S. 184, 194-95 (1998), the Supreme Court distinguished cases like *Cheek v. United States*, 498 U.S. 192 (1991) and *Ratzlaf v. United States*, 510 U.S. 135 (1994) from another context of willfulness on the grounds that the "highly technical statutes" involved in criminal tax prosecutions "carve out an exception to the traditional rule that ignorance of the law is no excuse and require that the defendant have knowledge of the law.") (internal quotation marks and citations omitted); *see also Am. Vending Group, Inc. v. United States*, 102 A.F.T.R.2d 6305, *6

(D. Md. 2008) ("Failing to read does not absolve a filer of his or his corporation's legal obligations. Of course if one does not read the instructions, one does not know of the obligation to file the informational returns.").

In *United States v. Williams*, the only case to examine willfulness in the context of a civil FBAR penalty, the Fourth Circuit recently held that a taxpayer was willful in failing to comply with FBAR requirements when he signed a federal tax return that failed to disclose the existence of foreign accounts, "thereby declaring under penalty of perjury that he had 'examined this return and accompanying schedules and statements' and that, to the best of his knowledge the return was 'true, accurate, and complete.'" *See United States v. Williams*, Case No. 10-2230, 2012 WL 2948569, at * 4 (4th Cir. Jul. 20, 2012). The Fourth Circuit reversed the district court's findings of fact as "clearly erroneous," on the grounds that the district court failed to consider the taxpayer's signature on his returns sufficient evidence of his knowledge of his failure to comply with the FBAR requirement. "A taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents." *Id*. (quoting *Greer v. Comm'r*, 595 F.3d 338, 347 n.4 (6th Cir. 2010)). At a minimum, "line 7a's directions to '[s]ee instructions for exceptions and filing requirements for Form TD F 90-22.1'" puts a taxpayer "on inquiry notice of the FBAR requirement." *Id*.  As a result, the Fourth Circuit held that Williams's explicit statement that he never consulted Form TD F 90-22.1 or its instructions, never read line 7a, and "never paid any attention to any of the written words on his federal tax return" constituted a "'conscious effort to avoid learning about reporting requirements,'" and his false answers on his federal tax return "evidence conduct that was 'meant to conceal or mislead sources of income or other financial information.'" *Id*. (quoting *Sturman*, 951 F.2d at 1476).

A taxpayer's signature on a return is sufficient proof of a taxpayer's knowledge of the instructions contained in the tax return form and in other contexts. "In general, individuals are charged with knowledge of the contents of documents they sign—that is, they have 'constructive knowledge' of those contents." *Consol. Edison Co. of N.Y., Inc. v. United States*, 221 F.3d 364, 371 (2d. Cir. 2000).  In *In re Crawley*, 244 B.R. 121, 130 (Bankr. N.D. Ill. 2000), the debtors contended that they did not read and review the information in their tax returns, which were prepared for them by their accountant, so they could not have failed to pay their taxes willfully. Despite not reviewing the returns, the court charged the debtors with knowledge of the contents of their returns, stating:

> [P]eople who sign tax returns omitting income or overstating deductions often blame their accountant or tax preparer. But these arguments never go anywhere. People are free to sign legal documents without reading them, but the documents are binding whether read or not.

*Id.* at 130 (quoting *Novitsky v. Am. Consulting Engr's, L.L.C.*, 196 F.3d 699, 702 (7th Cir. 1999)).

Many cases have cited the proposition that "[a] taxpayer's signature on a return does not in itself prove his knowledge of the contents, but knowledge may be inferred from the signature along with the surrounding facts and circumstances, and the signature is *prima facie* evidence that the signer knows the contents of the return." *See, e.g.*, *United States v. Mohney*, 949 F.2d 1397, 1407 (6th Cir 1991); *accord Hayman v. Comm'r*, 992 F.2d 1256, 1262 (2d Cir. 1993) (holding that where a taxpayer "claims to have signed the returns without reading them, [he or] she nevertheless is charged with constructive knowledge of their contents"). However, the "knowledge of the contents" discussed therein refers to the knowledge of what entries and submissions are made by the taxpayer or the taxpayer's preparer. *Mohney*, 949 F.2d at 1407 ("Such surrounding facts and circumstances include the defendant's knowledge of the business'

36

revenues, his active role in the operations, his hiring of the accounting firm, and his payment of the taxes."); *accord United States v. Drape*, 668 F.2d 22, 26 (1st Cir. 1982) ("Appellant's signature on his return was sufficient to establish knowledge once it had been shown that the return was false." (citing *United States v. Romanow*, 509 F.2d 26, 27 (1st Cir. 1974)). On the other hand, knowledge of what instructions are contained within the form is directly inferable from the contents of the form itself, even if it were a blank. FOF, ¶¶ 132, 137. If this court were to read *Mohney* otherwise, that result would conflict with the well-established legal principle that citizens are charged with knowledge of the law.

By the same token, in *Burack v. United States*, 461 F.2d 1282 (Ct. Cl. 1972), the court held that disregard of one's duties should not "be able to defeat the statutory liability fixed upon responsible persons by pleading that he did not know what he was signing and that his action was therefore not 'willful.'" *Id.* at 1292-93. That is precisely what McBride asks this court to do — to excuse his liability and knowledge of a plainly evident duty because he failed to read what he was signing. *Accord Katz v. United States*, 321 F.2d 7, 10 (1st Cir. 1963) ("A return is not short of wilful [sic] falsity because the taxpayer chooses to keep himself uninformed as to the full extent that it is insufficient, or as to what exact figures should have been inserted. Innocence cannot outdistance ignorance.").

Inferring knowledge of the contents of a return signed by the taxpayer is consistent with the conclusion drawn by the Sixth Circuit in *United States v. Sturman*, which held that, "It is reasonable to assume that a person who has foreign bank accounts would read the information specified by the government in tax forms," including the reference on Schedule B to the FBAR. 951 F.2d at 1477. Moreover, the line of criminal cases dealing with whether or not a taxpayer's signature on a return demonstrates knowledge of the contents has upheld convictions where the

jury was permitted to infer knowledge of the contents of the return from the signature on the return alone. *See, e.g., United States v. Olbres*, 61 F.3d 967, 971 (1st Cir. 1995) (in prosecution for tax fraud, "jury may permissibly infer that a taxpayer read his return and knew its contents from the bare fact that he signed it"); *United States v. Romanow*, 509 F.2d 26, 27 (1st Cir. 1975) (jury could believe from the uncontested signature of the defendant on return that he had read the form, despite his claim that he merely signed the return that was prepared by bookkeeper).

In another case where plaintiffs alleged that a bank had a duty to inform its depositors of the FBAR requirement, the district court held that the plaintiffs could not show justifiable or reasonable reliance on any advice given (or not given) by the bank in interpreting the instructions on the tax return. *See Thomas v. UBS AG*, No. 11C4798, 2012 WL 2396866, *5 n.2 (N.D. Ill. Jun. 21, 2012). "The simple yes-or-no question of Schedule B makes it inconceivable that [a taxpayer] could have misinterpreted this question." *Id.* (holding that it was not possible to have reasonably or justifiably relied on any negligent or fraudulent representation concerning the applicability of the FBAR requirement).

### B.     McBride had knowledge of his obligation to file FBAR reports for the foreign accounts, and failed to do so.

Knowledge of the law, including knowledge of the FBAR requirements, is imputed to McBride. The knowledge of the law regarding the requirement to file an FBAR is sufficient to inform McBride that he had a duty to file a Form TD F 90-22.1 for any foreign account in which he had a financial interest.

McBride signed his federal tax returns for both the tax year 2000 and 2001. FOF. ¶¶ 135, 140, 141. Accordingly, McBride is charged with having reviewed his tax return and having understood that the federal income tax return asked if at any time during the tax year, he held any financial interest in any foreign bank or financial account. FOF, ¶¶ 131, 136. The federal income

tax returns contained a plain instruction informing individuals that they have the duty to report

their interest in any foreign financial or bank accounts held during the taxable year. *See Thomas*,

2012 WL 2396866, at *5 n.2. McBride is therefore charged with having had knowledge of the

FBAR requirement to disclose his interest in any foreign financial or bank accounts, as

evidenced by his statement at the time he signed the returns, under penalty of perjury, that he

read, reviewed, and signed his own federal income tax returns for the tax years 2000 and 2001,

as indicated by his signature on the federal income tax returns for both 2000 and 2001. FOF, ¶¶

131-141. *See Williams*, Case No. 10-2230, at *12. As a result, McBride's willfulness is

supported by evidence of his false statements on his tax returns for both the 2000 and the 2001

tax years, and his signature, under penalty of perjury, that those statements were complete and

accurate. FOF, ¶¶ 131-141.

More importantly, McBride actually read the marketing and promotional materials

provided to him by Merrill Scott. FOF, ¶ 142. The marketing and promotional materials

informed McBride of the duty imposed by federal law that U.S. taxpayers are required to report

their interest in foreign bank and financial accounts. FOF, ¶¶ 21-23 ("As a U.S. taxpayer, the law

requires you to report your financial interest in, or signature authority over, any foreign bank

account, securities account, or other financial account"). As a result, McBride had actual

knowledge of his duty to file an FBAR for any account in which he had a financial interest prior

to filing his 2000 and 2001 tax returns. McBride even testified that "the purpose of Merrill Scott"

was to avoid disclosure and reporting the existence of interests "because . . . if you disclose the

accounts on the form, then you pay tax on them, so it went against what [he] set up Merrill Scott

for in the first place." FOF, ¶ 149.

McBride's claim that he did not know he had a legal duty to file FBARs is not credible. During his interviews with the IRS, McBride admitted to misleading the IRS, lying about several pertinent factual details, withholding information, and failing to disclose documentary evidence. FOF, ¶¶ 155-161. McBride has not only lied to the IRS, but has also made contradictory statements in his sworn responses to interrogatories and his testimony on the stand. *Compare* FOF, ¶¶ 26, 28 with ¶ 27. Moreover, once it was apparent the IRS was considering imposing the FBAR penalty, McBride has had every incentive to continue to conceal his awareness of the FBAR requirement. As a result, McBride's evasive course of conduct in lying to the IRS and concealing information is circumstantial evidence of McBride's willfulness. *See Sturman*, 951 F.2d at 1476 (holding that where a taxpayer "concealed his signature authority, his interests in various transactions, and his interest in corporations transferring cash to foreign banks" was conduct adequate to infer willfulness); *see also United States v. Dashney*, 117 F.3d 1197, 1203 (10th Cir. 1997) ("[I]n the structuring context, 'proof of concealment tends to prove knowledge of illegality.'") (quoting *United States v. Marder*, 48 F.3d 564, 574 (1st Cir. 1995)).

> ### 2.    McBride's Conduct was Reckless.

> #### A.    Recklessness Satisfies the Civil Willfulness Requirement.

Under the wilfulness analysis in the analogous § 6672 context, "A responsible person is reckless if he knew or should have known of a risk that the taxes were not being paid, had a reasonable opportunity to discover and remedy the problem, and yet failed to undertake reasonable efforts to ensure payment." *Jenkins v. U.S.*, 101 Fed. Cl. 122, 134 (Fed. Cl. 2011). In the same context, willfulness has been found where "the facts and circumstances of a particular case, taken as a whole, demonstrate" that the taxpayer "knew or should have known that there was a risk [of noncompliance] and failed to take available corrective action," with the result

being the violation of the law. *Id.* (citing *Ghandour v. United States*, 36 Fed. Cl. 53, 63 (Fed. Cl. 1996)); *accord Monday v. United States*, 421 F.2d 1210 (7th Cir. 1970).

In *Sorenson v. United States*, a case which involved a civil penalty for the willful failure to pay trust fund taxes to the United States, the taxpayer claimed he "mistakenly believed that withholding need not be made on salaries paid out of 'personal' funds." 521 F.2d 325 (9th Cir. 1975). However, the Ninth Circuit specifically rejected the argument that this subjective lack of knowledge excused the defendant from having knowledge of the duty imputed to him, stating, "He also had an accountant and an attorney available when he sought advice. If he did not understand his responsibilities it is because he did not ask those who could have informed him; and if he did not ask we are inclined to believe that was because he preferred ignorance." *Id.* at 329 (concluding that "he acted with a reckless disregard for obvious risks," sufficient to satisfy the willfulness requirement).

An individual's actions may be deemed willful if the individual recklessly ignores the risk that conduct is illegal by failing to investigate whether the conduct is legal. Taxpayers have long been cautioned that they have a responsibility to "investigate claims when they are likely 'too good to be true.'" *Pasternak v. Comm'r*, 990 F.2d 893, 903 (6th Cir. 1993) (quoting *McCrary v. Comm'r*, 92 T.C. 827, 850 (1989)). "When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril." *Neonatology Associates, P.A. v. Comm'r*, 299 F.3d 221, 234 (3rd Cir. 2002).

**B.     Willful Blindness Satisfies the Civil Willfulness Requirement.**

The same logic applies to those who deliberately avoid learning of their legal duty or the facts that would give rise to their wrongdoing. For an individual to have acted "wilfully," an

individual need not have been subjectively aware of the FBAR reporting requirement or else an individual would be able to defeat liability by deliberately avoiding learning of his or her legal duties. "To allow the most clever, inventive, and sophisticated wrongdoers to hide behind a constant and conscious purpose of avoiding knowledge of criminal misconduct would be an injustice in its own right." *United States v. Jinwright*, 683 F.3d 471, 478 (4th Cir. 2012). In order to demonstrate willful blindness, "a defendant must subjectively believe that there is a high probability that a fact exists and the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances*, 131 S. Ct. at 2070-2071.

### C.    McBride's Conduct Was Reckless and Willfully Blind as to the Obvious Risk of Failing to Comply With the FBAR Requirements.

McBride was either in reckless disregard of a known or obvious risk or willfully blind to the possibility of the failure to make the proper disclosures to the IRS as a result of his involvement in the Master Financial Plan.

### i.    Known or obvious risk.

Because McBride acted in reckless disregard of the known or obvious risks created by his involvement with Merrill Scott actual, subjective knowledge is not required for him to have willfully failed to comply with the FBAR requirements. *See Sorenson*, 521 F.2d at 330.

As described above, McBride had notice of the potential risks of failing to report one's interest in foreign bank accounts as a result of the correspondence between Taylor and himself, as well as the article attached by Taylor. FOF, ¶¶ 40-42. By the time McBride filed his income tax return for the tax year 2000, McBride was concerned about Merrill Scott, and it was, or should have been, obvious to McBride that Merrill Scott was employing illegal strategies. FOF, ¶¶ 145; *see* FOF, ¶ 13; *see also SEC v. Merrill Scott & Associates, Ltd. et al.*, Complaint for

Temporary Restraining Order, Preliminary and Permanent Injunctions and Legal and Other
Equitable Relief (Case No. 2:02-cv-0039, January 15, 2002).

The risk of failing to comply with all applicable reporting requirements with respect to
assets hidden through the Master Financial Plan was also obvious. McBride understood that he
was engaging Merrill Scott in order to take advantage of a scheme to avoid or defer taxes using
means that initially appeared to him to be tax evasion. FOF, ¶¶ 17, 19, 20. McBride was aware
that the strategies used by Merrill Scott involved using nominee directors and IBCs that would
disguise the true ownership of his assets in the Master Financial Plan. FOF, ¶¶ 64, 66, 69, 70, 74.
When Merrill Scott explained the Master Financial Plan, McBride's initial reaction was to say,
"This is tax evasion," demonstrating that the risk of potential noncompliance was obvious. FOF,
¶ 17. McBride even testified that "the purpose of Merrill Scott" was to avoid disclosure and
reporting the existence of his financial interests "because . . . if you disclose the accounts on the
form, then you pay tax on them, so it went against what [he] set up Merrill Scott for in the first
place." FOF, ¶ 149. And yet, McBride did not attempt to obtain a legal opinion that would
identify whether or not the scheme had any consequences with respect to his filing obligations.
FOF, ¶¶ 30, 31, 34. The risk of failing to comply with the FBAR requirements was therefore
known to McBride and obvious.

In addition, because the federal tax returns contain a plain instruction regarding the
disclosure of interests in foreign financial or bank accounts, the risk of failing to disclose an
interest in such a foreign account is obvious. The risk of failing to disclose a financial interest in
a foreign account is an obvious risk, given that the question on line 7a of Schedule B is available
to anyone who looks at a blank Form 1040 individual income tax return. *See Williams,* 2012 WL
2948569, at *4. Moreover, the question is simple and appraises anyone who reads it of an

obvious risk of failure to disclose one's interest in foreign financial accounts: "The simple yes-or-no question of Schedule B makes it inconceivable that [a taxpayer] could have misinterpreted this question." *See Thomas*, 2012 WL 2396866, at *5 n.2. As a result, the risk of failing to comply with the FBAR requirements is an obvious risk.

Therefore, even if McBride did not have actual, subjective knowledge of the FBAR requirements when he signed and filed his federal income tax returns for the tax years 2000 and 2001, the risk of failing to comply with the FBAR requirements was known or obvious.

### ii.     Reckless disregard.

In this case, McBride deliberately engineered a financial scheme, with the help of Merrill Scott, that he believed allowed him to remain unaware of his filing duties. His stated purpose of entering the Master Financial Plan was to make it appear that, for tax purposes, he did not have a financial interest in the foreign accounts that could be subject to any reporting requirements, whether reporting income or FBAR. FOF, ¶ 149.

McBride was aware of the potential risks, which include criminal liability, of engaging in activities resembling the strategies taken pursuant to the Master Financial Plan: placing assets in foreign bank accounts without reporting income or the existence of those accounts. FOF, ¶¶ 40-42. However, McBride did not care about the potential legal ramifications of the Master Financial Plan; he was "gung ho" about the plan. FOF, ¶ 32. He did not attempt to obtain an outside legal opinion to assess the legality of Merrill Scott's strategies. FOF, ¶¶ 30, 144. He now claims he did not even attempt to read the legal opinion provided to him. FOF, ¶ 143. He did not discuss the legality or consequences of the Master Financial Plan with Stayner, his accountant at the time. FOF, ¶ 31. He did not obtain any kind of feedback from his partner's accountant before

cutting two of the three checks paid to Merrill Scott in consideration of the Master Financial Plan.  FOF, ¶¶ 34, 37, 38.

Moreover, McBride was already suspicious of whether or not Merrill Scott was a legitimate business before he signed or filed his federal income taxes for the tax years 2000 or 2001. FOF, ¶¶ 116-118, 145. However, he did not seek a legal opinion regarding the validity of the Master Financial Plan, or his reporting obligations under it at that time either.

### iii.    Tax year 2000.

McBride's failure to disclose all of the pertinent and relevant information that must be disclosed constitutes evidence of willfulness. *See, e.g., Korecky v. Comm'r*, 781 F.2d 1566 (11th Cir. 1986) (holding that a taxpayer who failed to disclose all relevant financial statements and affairs to his accountant cannot rely on advice from that accountant as a defense to fraud, which includes a requirement of showing willfulness).

By virtue of his deliberately engineered belief that he did not have a financial interest in the foreign accounts, McBride did not disclose the existence of those accounts to Stayner, his accountant who prepared his income tax returns for the tax year 2000. FOF, ¶¶ 146-149. McBride was the only source of information regarding his financial affairs from which Stayner based the preparation of his returns, but McBride did not include any of the information regarding the Master Financial Plan or his involvement with Merrill Scott to Stayner. FOF, ¶¶ 145-150. McBride's decision to not disclose his involvement with Merrill Scott to Stayner was deliberate and knowing. FOF, ¶ 149. The fact that McBride did not discuss these significant financial strategies, involving millions of dollars, with his accountant for the tax year 2000 is significant evidence of willfulness or at least recklessness and willful blindness. *See Drape*, 668 F.2d at 25 (considering it "significant" in determining whether the taxpayer had acted willfully

that the taxpayer never discussed his participation in a tax shelter with his accountant for the previous year). Moreover, the fact that Stayner prepared McBride's return does not negate willfulness on McBride's part in failing to furnish Stayner with information concerning all of the relevant facts of his financial affairs. *See United States v. Samara*, 643 F.2d 701, 703 (10th Cir. 1981) ("Defendant's reliance on the advice of his lawyer and accountant does not negate willfulness unless defendant made a complete disclosure of all pertinent facts.") (citing *United States v. Jett*, 352 F.2d 179, 182 (6th Cir. 1965))

As such, McBride's failure to disclose all relevant information to Stayner is evidence of his willfulness, or at least his reckless disregard, of the potential consequences of failing to comply with the FBAR requirements. *See Korecky*, 781 F.2d at 1569. McBride subjectively believed that there was a high probability that a fact exists — namely, that there were reporting obligations that might be shirked by engaging in Merrill Scott and the Master Financial Plan. McBride further took steps to avoid learning of this fact by failing to disclose his participation in Merrill Scott to his accountant Stayner. As a result, McBride was willfully blind to the possibility that he had failed to comply with the FBAR requirements.  In addition, McBride's failure to seek a legal opinion concerning his reporting requirements was in reckless disregard of the known or obvious risk of failure to disclose his interest in a foreign account.  Therefore, McBride signed his returns with either full knowledge or reckless disregard of the high probability that they did not include all pertinent and required information.

Even if McBride did not already know of his legal duty to file an FBAR with respect to the foreign accounts, he did act deliberately in engineering a scheme that he believed would not require learning of this duty by reporting his financial affairs related to the Master Financial Plan. McBride's belief, that the purpose of entering into the arrangement with Merrill Scott was

to "avoid reporting" the income one received, demonstrates that he had a sufficiently willful mental state as to the reporting of either income or his financial interests in overseas accounts. At the very least, McBride must have been reckless as to the consequences of failing to report or disclose income sources, and therefore reckless as to whether or not his failure to report income would also result in a failure to comply with the FBAR requirements.

Furthermore, even if McBride were not charged with knowledge of the contents of a tax return by virtue of having signed it, the fact that McBride signed a federal income tax return without having an understanding as to its contents, while simultaneously engaging in transactions with foreign entities designed to avoid or defer tax, constitutes evidence of either willful blindness or recklessness.

### iv.    Tax Year 2001.

Though McBride asserted repeatedly that he relied on representations by Merrill Scott and its affiliated attorneys that the Master Financial Plan was legal, that reliance cannot negate willfulness. "Taxpayers may not rely on someone with an inherent conflict of interest, or someone with no knowledge concerning that matter upon which the advice is given." *Chamberlain v. Comm'r*, 66 F.3d 729, 732 (5th Cir. 1995) (citations omitted)).  McBride accepted responsibility for completing his own federal income tax returns, despite offers by Merrill Scott to prepare them for him. FOF, ¶¶ 35, 36.

In 2001, McBride claims to have relied on Taylor to determine whether or not he was subject to any reporting requirements for his interest in the foreign accounts.  However, McBride did not call Taylor as a witness, so the court was presented only with conflicting evidence as to Taylor's out of court statements.

In a declaration signed by Taylor on March 3, 2010, Taylor stated that McBride "never informed [him] that [McBride] had any foreign bank accounts."  Plaintiff's Ex. 8 at ¶ 6.  There was no testimony that Taylor told McBride not to report his interests in the foreign bank accounts.  Even if Taylor was fully aware of the Merrill Scott scheme, yet failed to properly advise McBride to report his interests in the foreign accounts, this would not excuse McBride. The taxpayer, not the preparer, has the ultimate responsibility to file his or her return and pay the tax due. *Kooyers v. Comm'r*, T.C. Memo. 2004-281 (2004). This duty cannot generally be avoided by relying on an agent. *Estate of Clause v. Comm'r*, 122 T.C. 115, 123-24 (2004); *Am. Props, Inc. v. Comm'r*, 28 T.C. 1100, (1957), *aff'd*, 262 F.2d 150 (9th Cir. 1958).  McBride knew, or at least made himself willfully blind, about the need to report his interests in the foreign accounts when he signed his 2000 return.  That Mr. Taylor may have further facilitated McBride's willful blindness a year later by failing to dispense proper advice does not render McBride's failure to report his interest in foreign accounts any less willful.

Moreover, even if the decision not to disclose McBride's interest in the foreign accounts was based on McBride's belief that he did not hold sufficient interest in those accounts to warrant disclosure, that failure to disclose those interests would constitute willfulness. *Lefcourt*, 125 F.3d at 83 (*"Once it is determined, as it was here, that the failure to disclose . . .  information was done purposefully, rather than inadvertently, it is irrelevant that the filer may have believed he was legally justified in withholding such information. The only question that remains is whether the law required its disclosure."*). Because McBride signed his tax returns, he is charged with knowledge of the duty to comply with the FBAR requirements. *United States v. Williams*, Case No. 10-2230, *12. Whether McBride believed Taylor had determined that a disclosure was not required is irrelevant in light of *Lefcourt*, which states that the only question is whether the

decision not to disclose was voluntary, as opposed to accidental. The government does not dispute that McBride's failure to comply with FBAR was the result of his belief that he did not have a reportable financial interest in the foreign accounts. However, because it is irrelevant that McBride "may have believed he was legally justified in withholding such information[,] [t]he only question that remains is whether the law required its disclosure." *Lefcourt*, 125 F.3d at 83. Here, the FBAR requirements did require that McBride disclose his interests in the foreign accounts during both the 2000 and the 2001 tax years. As a result, McBride's failure to do so was willful.

### g.   The amounts of the assessed FBAR penalties are proper.

As it existed prior to an amendment that took effect in 2004, Section 5321(a)(5)(B)(ii) authorized penalties of "(I) an amount (not to exceed $100,000) equal to the balance in the account at the time of the violation; or (II) $25,000."  The penalties at issue were assessed against McBride in the amount of $200,000 – $100,000 for 2000, and $100,000 for 2001. *See* FOF ¶¶ 163, 164.  These penalties were justified under Section 5321(a)(5)(B)(ii)(I) because the foreign bank accounts each had balances of at least $10,000 in 2000 and 2001 as demonstrated by statements issued for those accounts. FOF, ¶¶ 57-60, 109, 110, 113, 114. Accordingly, the amounts of the penalties were proper.  In addition to the amounts assessed, the United States is entitled to interest and penalties pursuant to 31 U.S.C § 3717.

### CONCLUSION AND ORDER

The United States has established, by a preponderance of the evidence, each of the requirements of 31 U.S.C. § 5321 with respect to the assessment against McBride for the tax years 2000 and 2001.

IT IS THEREFORE ORDERED that judgment is ENTERED in favor of the Plaintiff United States of America and against Defendant Jon McBride in the amount of $200,000, plus interest and penalties in the amount of $74,621.92 pursuant to 31 U.S.C. § 3717.

DATED this 8th day of November, 2012.

BY THE COURT:

_____
David Nuffer
United States District Judge